IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JODI SHAW, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| SMITH COLLEGE, KIA BROWN, HANNAH DURRANT | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES; JURY DEMAND**

Plaintiff Jodi Shaw ("Shaw"), for her causes of action against defendants Smith College ("Smith"), Kia Brown ("Brown), and Hannah Durrant ("Durrant"), states as follows:

**INTRODUCTION AND SUMMARY OF THE COMPLAINT**

1.      Federal and state civil rights laws prohibit racial discrimination in employment and apply equally to individuals of all races and ethnicities.

2.      Over the last several years Defendant Smith College fostered a toxic climate of racial fear, hostility, and exclusion. This was felt most deeply by lower-level employees like Plaintiff Jodi Shaw who, while simply trying to make ends meet, suddenly found themselves thrust into the middle of an ideologically driven campaign of race-essentialism and collective guilt pushed by the school.

1

3.      Specifically, Smith adopted an official policy of viewing every aspect of its operations through a racial lens; one that distorts all whites into malevolent oppressors and all people of color into hapless victims, regardless of any individual's actual position or status. This policy permeated every decision and action taken by the school.

4.      During Shaw's tenure at Smith she was denied a significant professional career advancement opportunity when she was told by her supervisors that they canceled an orientation program she organized "because you are white." In addition, defendants expected Shaw to implement and promote a "Residential Life Curriculum" in which students were instructed to project stereotypes and assumptions onto themselves and others based on skin color. Defendants required Shaw to maintain racially segregated student housing, called "affinity houses." At a mandatory professional development retreat Shaw was publicly humiliated for not admitting to "white supremacy" and "white privilege" and was continually expected to submit to shaming and harassing group race therapy as an ongoing condition of employment.

5.      When Shaw objected to these policies and the racially hostile environment at Smith College, defendants retaliated against her, attempted to stymie her efforts to file an internal complaint, and then hedged and delayed their investigation. Defendants steadily removed Plaintiff's job responsibilities, denied her promotional opportunities consistent with all of her colleagues, placed her on furlough, launched a pretextual investigation into her email usage, and deliberately made any further employment at Smith College impossible for Shaw.

## JURISDICTION AND VENUE

6.      This court has jurisdiction because Plaintiff's causes of action arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq*., as well as 42 U.S.C. § 1981.

7.     This Court has supplemental jurisdiction over all state claims under 28 U.S.C. § 1367(a).

8.     Venue is proper in the U.S. District Court for the District of Massachusetts under 28 U.S.C. § 1391(b) because the relevant employment of the plaintiff was in Massachusetts, and the Defendants reside within the jurisdiction of this Court, and a substantial part of the acts and omissions giving rise to Plaintiff's claims took place within the jurisdiction of this Court.

**PARTIES**

9.     Plaintiff Jodi Shaw, a resident of Northampton, Massachusetts and single mother of two children, was, at all times relevant to this Complaint, an employee of Smith College.

10.     Ms. Shaw is an alumna of Smith College, where she earned her degree in cultural anthropology.

11.     Defendant Smith College is a private women's college with a principal place of business in Northampton, Massachusetts.

12.     Defendant Kia Brown was, beginning in Spring of 2019, the Assistant Director of Housing Operations at Smith College. Defendant Brown retaliated against Ms. Shaw by, among other things, threatening to take key job responsibilities away from Plaintiff, excluding Ms. Shaw from work related meetings, and sabotaging Plaintiff's work after she filed an internal complaint with Smith regarding the racially hostile environment.

13.     Upon information and belief, Brown is a resident of Northampton, Massachusetts.

14.     Defendant Hannah Durrant was, at times relevant to this Complaint, Ms. Shaw's supervisor and the Director of Residence Life at Smith College.

15.     Defendant Durrant repeatedly treated Plaintiff differently because of her race, required her to attend a retreat where she was publicly humiliated on racial grounds, and

increasingly took away her job responsibilities after she brought an internal complaint about the

hostile environment, and made disparaging remarks about white people.

16.     Upon information and belief, Durrant is a resident of Northampton,

Massachusetts.

## FACTS COMMON TO ALL COUNTS

**A.     Smith College Makes Racism into Policy**

17.     On July 31, 2018 a black Smith student called Oumou Kanoute ("Kanoute")

publicly accused a white janitor of calling campus security on her for "eating while black."

18.     In fact, as Smith's own investigation showed, Kanoute's accusation of racism was

demonstrably false.

19.      Ms. Kanoute was eating lunch in a building set aside for a children's summer

camp program, in which only children in the program and the adults affiliated with the

program—who had all provided child-abuse clearances—were permitted to be present.

20.     The janitor followed Smith's explicit procedures for reporting these incidents and

the campus officer who arrived at the scene explained that to Ms. Kanoute, who recorded him

with her phone and posted it on social media.

21.     As a result of Ms. Kanoute's post, the incident garnered international media

attention.

22.     Shortly after the July 31, 2018 incident, Ms. Kanoute posted the names,

photographs, and contact information of two white staff members who she wrongly accused of

placing a racially motivated call to campus security.

23.     The staff Ms. Kanoute accused had not, in fact, been the people to call campus

security at all; moreover, the student reiterated her false allegation that campus security was

4

called because she was black, not because she was in an area where students were not allowed

unless they were with the summer camp program, regardless of race.

24.     Prior to conducting any investigation or attempting to obtain all relevant facts,

Smith blindly accepted the student's false accusations and vociferously denounced its stunned

staff members as racists in numerous public statements.

25.     In response to Ms. Kanoute's false allegations, Smith immediately began

subjecting all low-level staff, but not faculty, to attend punitive, racially hostile "anti-bias"

training.

26.     Smith also instituted radical, sweeping policy changes and programming whose

goal is to force white staff to affirmatively and publicly accept complicity in "white supremacy"

as well as to demonstrate and verbalize guilt for both historical injustices and any racial

disparities that may exist in the present.

27.     Three months after the July 31, 2018 incident, Smith quietly released the findings

of its internal investigation.

28.     The investigation's conclusions completely exonerated the falsely accused staff

members—a janitor, a cafeteria worker, and a security guard of 33 years.

29.     Contrary to its very public outcries immediately after the incident, Smith's

leadership was conspicuously silent after the release of the investigative report.

30.     Regardless, the false accusations had deep and lasting consequences for the staff

at issue despite that they bore no culpability for any racially discriminatory conduct whatsoever.

31.      At least one security officer of 33 years was removed from duty by Smith for

pretextual reasons.

32.     The falsely accused janitor left Smith because the school sponsored his public and spurious excoriation.

33.     Another staff member, a cafeteria worker, remained at Smith but suffered a torrent of harassing behavior, including phone calls and abusive letters left at her private home address and inside of her car.

34.     The staff cafeteria worker was singled out on campus, with students making comments such as "there's the racist."

35.     As recently as May 10, 2020, almost two years after the incident, Ms. Kanoute called this cafeteria worker a "racist bitch" in a campus dining hall where the staff member was working, despite that the worker had no involvement in the July 31, 2018 incident and bore no culpability for any racially discriminatory conduct whatsoever.

36.     In May, 2021, this cafeteria worker received an anonymous note left for her on the job calling her a "racist."

37.     In the fall of 2021, as this cafeteria worker walked on campus, multiple students of color pointed to her and said "that's the one Oumou warned us about."

38.     One staff member at Smith provided comment to a local newspaper, writing that Smith staff live in "climate of fear, hostility and exclusion" due to its handling of the July 31, 2018 incident, and that "staff morale is at an all-time low."

39.     As a result of Ms. Kanoute's false accusations and Smith's total mishandling of them, the lives of three dedicated staff members have been seriously disrupted, their jobs have been jeopardized, they have been labeled as racists, and have had nasty comments and threats directed at them.

6

40.     There was no statement from Defendant Smith College denouncing the false and public shaming of staff; no public apology for its role in inciting the mob against its innocent employees; rather, Smith completely failed to take responsibility and correct course in order to advance a radical agenda which discriminated against its employees (including against Ms. Shaw) on the basis of race.

41.     Instead, Smith made multiple public apologies to Kanoute.

42.     After the incident, Smith intensified the effort of reshaping its official policy to make race the primary determining factor in campus life, educational, and employment decisions.

**B.    Racially Hostile Environment Permeates the Library**

43.     At the time of the July 31, 2018 incident Ms. Shaw, who has a library science degree, was employed in the Smith College Library.

44.     A single mother who returned to her alma mater to raise her children in Northampton, Ms. Shaw had good reason to believe she would progress professionally at Smith.

45.     In late 2017 Ms. Shaw began working in the library as a temporary agency worker, her position lasting approximately a year.

46.     From the time Ms. Shaw started working until mid-2018, Library Supervisor Barbara Polowy requested that Ms. Shaw extend her original term of employment for multiple semesters.

47.     During her time at the Library, Ms. Shaw she received numerous thank you notes from students for her work in the library.

48.     As a result of her exceptional performance, Ms. Shaw was promoted from a temporary agency worker to an official, nonexempt employee of Smith.

49.     In the summer of 2018, Smith asked Plaintiff to prepare a memorable and entertaining orientation performance for 600 first-year students, being told to put "something crazy" together.

50.     Plaintiff worked hard on this event because she had recently applied for a new, higher-level position called the First Year Experience Librarian.

51.     The First Year Experience Librarian position matched Ms. Shaw's skill-set; indeed, Ms. Shaw's supervisor had tasked her with writing a proposal description for the job and indicated that it was as good as hers.

52.     Ms. Shaw has a background in music composition and performance and proposed a good-humored "library rap," accompanied by a band of students and local musicians for the orientation performance; her supervisors raised no objection.

53.     However, soon after the July 31, 2018 incident, Smith's campus policies grew increasingly race-obsessed.

54.     Plaintiff also found herself working for new supervisor at the library, Brendan O'Connell ("O'Connell"), after Polowy retired.

55.     One week before the orientation, after Shaw had spent countless hours preparing, O'Connell informed Shaw that she and the group of students and local musicians could not proceed with the "library rap."

56.     When Ms. Shaw asked why she could not proceed, O'Connell replied, "because you are white."

57.     Shaw asked O'Connell if she would be able to put on the performance if she were a person of color; without hesitation, he replied "yes."

58.     That same day, after informing Shaw that she may not perform the library rap "because you are white," O'Connell announced three other candidates for the job Shaw was seeking, all of whom were non-white.

59.     O'Connell had removed the library science education requirements that are standard for librarians in an effort to "attract a more diverse pool of candidates."

60.     O'Connell instructed Ms. Shaw to create a new orientation performance, from scratch, on impossibly short notice—less than one week.

61.     When Ms. Shaw met with Smith to discuss the situation, Smith's management told her "[t]his is a great opportunity for us to see your resilience and creativity in how you manage to turn this around by next Wednesday, in light of your candidacy for the First Years' Experience position."

62.     Based on the foregoing, Ms. Shaw reasonably concluded and realized that her chances at the job were doomed, especially after a member of the hiring committee told her "it isn't looking good."

63.     Ms. Shaw withdrew her application, in part to avoid further racial humiliation.

64.     Subsequently, Ms. Shaw met with Human Resources and Smith's Ombudsman to discuss what had happened to her, but neither took it seriously or mentioned the possibility of filing a complaint.

65.     Both however suggested that Ms. Shaw leave the library to take a lower-paying job in the Student Affairs/Residence Life Department if such a position were to be offered to her.

66.     These meetings made Ms. Shaw believe that if she lodged a discrimination complaint it would not be properly considered and might even hurt her chances of obtaining a job in another department.

67.     When Ms. Shaw began pursuing an "After Action" review of the performance cancellation, she stopped when she was told O'Connell would attend the review.

**C.     Smith's Racist Policies Extend to Student Housing**

68.     In October 2018, following the withdrawal of her application for the First Year Experience Librarian position, Ms. Shaw assumed the lower paid, non-exempt position of Student Support Coordinator in Residence Life.

69.     In or about January 2019, during one of Ms. Shaw's introductory professional development meetings at Residence Life, Ms. Shaw was required to discuss the ways in which Smith "upholds white supremacist values."

70.     In response to a question about what was wrong with Smith, a black colleague began banging his fist on the table chanting "Rich white women! Rich white women!" referring to Smith alums.

71.     The black colleague did this three times, categorizing Smith alumnae by race as white supremacist based on their skin color; no one in the meeting expressed concern with this behavior.

72.     Afterwards Ms. Shaw complained to her supervisor, Defendant Hannah Durrant, but Durrant dismissed her.

73.     In another conversation, Durrant explained to Shaw in no uncertain terms that employment and disciplinary decisions were made on the basis of race at Smith.

74.      Specifically, Ms. Durrant said that a complaint about tardiness and time management concerning the employee who had been shouting about "rich white ladies" was ignored by Smith because the employee is "black and gay."

75.     Smith not only condones and encourages the disparagement of individuals based on race but also uses race to make employment and disciplinary decisions about other employees.

76.     For example, Smith disseminated a training with Office of Inclusion and Equity administrator and "point person for low income, first gen, trans and non-binary students" Toby Davis ("Davis").

77.     The training focused on Smith's policy of requiring Resident Life employees to treat coworkers and students differently based on identities such as race, sex, etc.

78.     One part of the training included a video called "White Privilege Glasses" featuring a white man who puts on a pair of 3D glasses that give him magical powers to see the world as black people allegedly do.

79.     In one portion of the video, the white man—before donning the glasses—sees a police officer who politely nods to him; however, as soon as the man puts on the "white privilege glasses" the police officer violently lunges at him.

80.     Next, the white man looks up at a street intersection and sees the signs for Jefferson St. and Washington St.

81.     When he dons the magic glasses both street signs suddenly say "SLAVE OWNER." **Ex. A.**

82.     The video continues in a similar vein as does the rest of the Smith College training.[1]

---

[1] This video is available on YouTube at https://youtu.be/E56Q1CzYBY4.

83.     In one example of Smith's expectations as to how it wanted Ms. Shaw to fulfill her obligations as Student Support Coordinator, the school required Plaintiff to interact with students differently based upon their race.

84.     Recreational use of marijuana was legalized in Massachusetts in late 2018 and there was a corresponding surge in use in campus housing, which was against Smith's policies; this led to requests for housing accommodations for students adversely affected by marijuana smoke.

85.     As a solution to help adversely affected students, Shaw suggested a facially neutral policy to enforce the college's rules by asking students to call campus police when they smelled smoke.

86.     Ms. Shaw's idea was quickly shut down and it was implied that she was racist for even suggesting it; according to Smith, "students of color would feel 'traumatized' by police at Smith," perhaps the most exclusive and secluded women's colleges in the country.

87.     When Ms. Shaw suggested that students of color may also be adversely affected by marijuana smoke and would maybe benefit from equal enforcement of the rules she was again rebuffed.

88.     Another instance of Smith requiring Ms. Shaw to treat students differently based on race involved fulfillment of housing accommodations relating to Smith's Office of Disability Services.

89.     Smith required that Ms. Shaw, as a condition of her employment, deviate from process in accommodating students with disabilities and discriminate against a white student because of her race.

90.     In or about March 2019, a conflict emerged between Kanoute (the student from the July 2018 incident), a sophomore, and a white student, a senior with a service dog who lived in the dorm above Kanoute.

91.     Before Smith's department of Residence Life knew the skin colors of the students, they advised Shaw to offer the student with less seniority a room change; however, when management at Residence Life discovered that the objecting student was black, they immediately changed their position and required Shaw to offer the room change to the student with the service dog.

92.     When the owner of the service-dog company—labeled by one of Shaw's Residential Life colleague as an "entitled white lady"—became involved, Smith changed course again.

93.      However, before Smith reversed itself, Ms. Shaw was forced to cope with the distress of knowing that she may be the target of litigation and could be held personally liable for having to follow Smith's racist policy directives, and with the knowledge that she was being forced to cause a young student great turmoil and distress of her own which required therapy, on the basis of the student's skin color.

94.     Around this time, Smith abruptly terminated two white staff members, both of whom were falsely accused by students of racism, showing its willingness to ruin the reputation and career of any staff member accused of racism with no substantiating evidence; Ms. Shaw and other Smith staff took notice.

95.     In April 2019, Ms. Shaw arrived at her office at her office building to find a four-page list of student racial justice demands taped to her office door.

96.     The demands taped to Ms. Shaw's office door included express threats.

97.     The demand letter's introduction stated, "If these demands are not met, our anger will be made clear to you, and you will feel it to the deepest extent to which our pains are felt. This is OUR campus, and we will take our fight to every house, every office, and every person who needs to be fought."

98.     More threatening messages would appear during this time.

99.     Two large posters were fixed to the pillars of the front of the building.

100.    One poster read: "If Smith employees fail to do their job, and Smith tries to cover it up, who will hold Smith accountable? #smithfailedme #mysmith."

101.    The other poster read: "No more empty promises, we want ACTIONS #holdSmithaccountable."

102.    To Plaintiff's best knowledge such communications were found only at the Clark Hall building; Smith made no effort to investigate.

103.    Smith administration did nothing to assure Ms. Shaw and other staff that they would not be attacked as the letters threatened; nor did any of Shaw's supervisors in Residence Life ask staff about the threatening demand letters posted on all their office doors or what they would be doing to protect staff.

104.    Smith's failure to respond adequately to the threatening letters added to a climate of racial hostility and a racially hostile environment that Smith had created and had recently been exacerbated by the race-based terminations of two white staff members.

105.    Rather than respond adequately, Smith went even further in its creation of a racially hostile environment for Ms. Shaw and other staff members by immediately issuing a letter to the "community" announcing the steps the college would take to meet the activists' demands, which included the creation of racially segregated "affinity houses."

14

106.     In the spring of 2019, Ms. Shaw requested and was granted a meeting with Defendant Durrant to discuss how she might communicate more effectively with her relatively new supervisor, Defendant Kia Brown.

107.     During this 2019 meeting, the only input Durrant gave Ms. Shaw was, "remember, Kia is a brown woman from Baltimore."

108.     Other than the mention of Ms. Brown's race, although Durrant did provide some helpful advice, she did not provide any substantive, meaningful response to Shaw's work-related question.

109.     When Ms. Shaw asked Ms. Durrant to elaborate on what her advice meant, Durrant refused.

110.     In November 2019, Ms. Shaw was strongly encouraged by her supervisors to attend Otelia Cromwell Day events, moderated by Floyd Cheung ("Cheung") who was VP for the Office of Inclusion and Equity.

111.     The events provide "dedicated time and space for reflection and education about diversity, racism and inclusion" where "the college seeks to take individual and community responsibility for our behavior with an awareness of how that behavior furthers and disrupts patterns of structural oppression."

112.     The observance includes many workshops throughout the day, whose topics are all some variation of "Why Is It So Difficult for White People to See and Understand Racism and White Supremacy?" **Ex. B.**

113.     At one of the events that Ms. Shaw attended, the speaker told the audience, "[R]acism is in our [white people's] DNA" and "if you are white and have ever accomplished anything in your life it is not due to your hard work, it is due to the privilege of your white skin."

15

114.    The speaker's race-based comments were buttressed by an equally offensive slide show.  **Ex. C.**

115.    It was very common to hear negative remarks about white people from supervisors at Smith.

116.    This was not limited to frequent, casual remarks but also articulation of Smith policy when it comes to conditions of employment and student matters.

117.    For instance, during the hiring process for new positions in Residence Life Ms. Shaw heard Defendant Durrant comment about a phone interview she had with candidates: "They were all solid," adding that she felt good about all of them, "but I don't want to just hire four white people, you know what I mean? Maybe two white and two of color. Something like that."

118.    On another occasion, when Ms. Shaw was discussing sending her children to a local charter school, Ms. Durrant commented that charter schools are racist because they're run by white people.

119.    In November 2019, Cheung, VP of Inclusion and Equity, announced his office would be hosting "affinity luncheons."

120.    Cheung sent Ms. Shaw and other staff a link to a form containing a list of categories, asking respondents select the groups they "identify" with and submit the form.

121.    The form listed all races/colors and other particular aspects of protected categories such as sexual orientation/gender, disability status, and national origin.

122.    All the categories consisted of all conceivable immutable, protected characteristics except "white/Caucasian."

123.    In November 2019, Stacey Steinbach, Smith's Assistant Director for Residential Leadership, invited Plaintiff to her office to learn more about the Social Justice curriculum.

124.    After Shaw told her she did not want to discuss race at the staff meetings, Steinbach replied "it is a privilege for you to not have to discuss skin color."

125.    Ms. Steinbach gave Ms. Shaw a handout called "Social Justice terms, concepts, and resources" and told her it was the model for Smith's Resident Life curriculum.

126.    Ms. Shaw was required to participate in the creation of a curriculum that included trainings on "white privilege," and the division of individuals into oppressor and oppressed categories based on skin color, for incoming students.

127.    Students are instructed to "design your own racist community" and share with the group. **Ex. D.**

128.    White students are instructed not to look with a "white gaze" and to remove their "white privilege glasses."

**D.**    **Shaw is Forced to Racially Segregate Student Housing**

129.    Defendant Smith lurched even further into making unlawful racial discrimination and creation of a racially hostile environment into policy when it created racially segregated housing on campus in the fall of 2019.

130.    "Affinity houses" are dormitories reserved for students based on race or other preferred identities.

131.    In practice, more beds were available in the "affinity houses" than there was demand because segregation among Smith's student body is not actually popular.

132.    When these "affinity houses" we implemented in the Fall of 2019 there were more incoming students (regardless of race) than there were available beds in the non-segregated residence halls.

133.    Still, despite the empty beds available in "affinity houses," Smith placed several first-year white students who did not have beds into temporary makeshift living spaces in dormitory living rooms; Smith instructed Ms. Shaw to execute this race-based protocol.

134.    One Smith housekeeping staff member, after learning of the creation of affinity houses just for black students, asked "are the students going to be okay with us [white staff] going in there to clean?"

135.    Ms. Shaw suggested to Residence Life that the incoming white first years who did not have permanent beds be assigned to an empty room in an "affinity house" reserved for black students, but Defendant Brown firmly refused.

136.    The white first-year students had to remain in temporary housing assignments due to Smith maintaining segregated housing, and therefore, Ms. Shaw found herself, as a condition of her employment, designating room and board by skin color.

137.    Ms. Shaw was also expected to support a Residence Life curriculum that instructs students to make assumptions and project stereotypes based on race.

138.    Smith expected Ms. Shaw to uphold and reinforce these stereotypes.

139.    Plaintiff objected to her supervisors that she was uncomfortable making assumptions about people based on solely on observable skin color and felt it wrong to promote any ideology that did.

140.    Smith's Residence Life Curriculum, including newsletters and other literature, clearly demonstrates and reflects Smith's racist content and instruction.

18

E.      **Smith's Diversity Facilitator Racially Humiliates Shaw in Front of Her Colleagues**

141.    In January 2020, Smith required Ms. Shaw to attend a Residence Life staff retreat focused—as so much of Smith's programming does—on racial issues.

142.    Ms. Shaw learned of the upcoming retreat and, in light of the gratuitous, anti-white rhetoric Smith was hosting on campus and regularly sending to her email account—to say nothing of the treatment of staff following the July 31, 2018 incident—she sought to abstain from talking about race with her colleagues.

143.    Ms. Shaw approached her supervisor, Defendant Durrant, privately to convey her discomfort with the request that she discuss her thoughts and feelings about her race/color at work, particularly at the upcoming retreat where she knew it would be a focal point.

144.    Ms. Durrant told Shaw she could abstain from the discussion, suggesting Shaw respond to any request to discuss her race by saying "I'm uncomfortable discussing that."

145.    Ms. Durrant was present at the retreat and race therapy session conducted by facilitators hired by Smith who asked each member of the Residential Life department to respond to intensely personal questions about their race and racial identity, such as how each staff member felt about their "racial identity … as a child."

146.    When it was Ms. Shaw's turn to respond, she followed Ms. Durrant's instructions saying "I don't feel comfortable talking about that."

147.    The retreat facilitators then responded to Ms. Shaw's intent to abstain from discussing race by announcing publicly that "discomfort and resistance by a white person to discussing race or skin color is a symptom of *white fragility*."

19

148.     Smith's presenters told Ms. Shaw and other staff in attendance that a "white person" who says they are uncomfortable with such a discussion "may seem like they are in distress," but that it is actually a "power play."

149.     In other words, according to Smith and its presenters at the retreat, any white person, even a low-level staff member, who objects to discussing their race publicly at work as a condition of employment is, by definition, engaging in racial aggression

150.     Ms. Shaw was directly shamed and humiliated in front of her colleagues for abstaining and was subjectively offended.

151.     A reasonable person in Ms. Shaw's position would have felt offended by being singled out based on race in this manner.

152.     At the retreat, the facilitators also asked participants, including Ms. Shaw, to describe how they "feel" about working in teams.

153.     Ms. Shaw disclosed that she felt more confident and productive working independently.

154.     Shortly after that the facilitators disseminated a handout entitled "characteristics of white supremacy culture," which stated that "individualism" is a characteristic of white supremacy. **Ex. E.**

155.     Participants, who were mostly lower-level housing staff, were asked to divulge their racial experiences extending back to childhood and about their childhood.

156.     The experience of the retreat left Ms. Shaw traumatized, and when she informed her supervisors, Defendants Brown and Durrant of this, they held it against her.

157.     Indeed, Brown told Ms. Shaw her "performance" at the training represented a deficiency in the job requirement of "Cultural Competency."

**F.**     **Plaintiff Files Internal Complaint**

158.     Following the retreat, Defendant Durrant expressed disappointment with Ms. Shaw's behavior—specifically, her unwillingness to discuss her "race" in a public setting.

159.     Ms. Shaw replied that she did not believe her skin color was relevant to her work duties and performance and that she was uncomfortable discussing it especially since it was nowhere in her job description, to which Durrant replied, "your job description needs to be changed anyway."

160.     In January 2020, Ms. Shaw was discussing her children's charter school with a colleague.

161.     Durrant, who was in the room, interrupted to note that Charter Schools are racist and privileged because they are "run by white people."

162.     The implication of Durrant's comment was that Shaw was complicit in this racism.

163.     Ms. Shaw told Brown that she was experiencing emotional distress as a result of the retreat and Smith's increasing insistence on tying race into every part of the workplace environment.

164.     Ms. Shaw's distress resulting from and caused by Smith's creation of a racially hostile environment was compounded by the illness of Ms. Shaw's father, whom Ms. Shaw knew would soon be placed in hospice care and would pass away in May 2020.

165.     Ms. Shaw told Ms. Brown that she was now even more uncomfortable discussing race/skin color at work and would no longer participate in discussions that singled out employees based on race.

166.    Ms. Brown responded that discussing and categorizing people based on skin color was part of Shaw's job.

167.    Ms. Shaw again was surprised and reiterated that this was not listed anywhere in her job duties.

168.    Like Defendant Durrant, Brown informed Ms. Shaw that her job description needed to be changed.

169.    In February of 2020, Brown told Shaw to register her complaints about race to Durrant, not Brown, even though Brown was Shaw's immediate supervisor.

170.    Brown remarked on or about February 17, 2020 that several colleagues were mocking Shaw about her "feels"—a disparaging, memetic internet term used to ridicule a person's feelings—about race following the January retreat.

171.    Seeing that her supervisors not only supported but exacerbated the environment of racial hostility in her department, Ms. Shaw decided to appeal to the office that existed at Smith specifically to combat discrimination.

172.    On or about February 3, 2020, Shaw met with Amy Hunter ("Hunter"), Smith's Director of Equal Opportunity and Compliance, to discuss filing an internal complaint of racial discrimination and hostility according to Smith's grievance procedures.

173.    Hunter's response was to ask, "do you believe in white privilege?"

174.    Although Hunter was the individual who was responsible for investigating claims of racial discrimination at Smith, she explicitly told Ms. Shaw that she would not take this on because Shaw is white.

22

175.    Additionally, Hunter informed Ms. Shaw that the Civil Rights Act was created to protect "traditionally marginalized groups" and that an outside investigator would be the one to handle Shaw's complaint.

176.    During a subsequent phone call with Hunter, Ms. Shaw expressed her fear of retaliation and told Hunter that her supervisors had suggested her job description needed to be changed after she expressed her concerns about being discriminated against. Hunter responded simply that Smith is allowed to change Shaw's job description. Soon after Ms. Shaw's meeting with Hunter, Defendant Durrant came to Ms. Shaw's office and began discussing her intent to file a complaint.

177.    During this interaction, Ms. Durrant pressured Ms. Shaw to drop the idea of filing a complaint because it was "time consuming" and to instead opt for a pre-complaint mediation or resolution in order to help Ms. Shaw "save time;" Ms. Shaw declined.

**G.      Post-Complaint Retaliation**

178.    On or about March 2, 2020, Ms. Shaw filed the first of a two-part internal complaint with Smith.

179.    Ms. Shaw filed the first part of her complaint—about her treatment at the January 2020 staff retreat—before the rest of her complaint was finished because she wanted to document her complaint and get the process started in order to deter Smith's retaliation.

180.    A few days later, Ms. Shaw had a meeting with Defendant Brown.

181.    At the meeting, Brown surprised Ms. Shaw by informing her that "large chunks of responsibilities" might be taken away from her, which could result in adverse employment consequences concerning salary and eligibility for overtime pay.

182.     Specifically, Brown suggested to Ms. Shaw that she would remove certain responsibilities that constituted the most significant portion of Ms. Shaw's job—for which she was singularly qualified—and for which she received slightly higher pay.

183.     This adverse employment action was in direct retaliation for Ms. Shaw filing her complaint and meant to dissuade her from continuing with the process.

184.     Smith had no legitimate basis or business purpose for its removal of job duties from Ms. Shaw.

185.     On or about March 26, 2020, Ms. Shaw had a phone conversation with Hunter about her internal grievance.

186.     Ms. Shaw reiterated her understanding that Hunter was the person who handles such claims but Hunter repeated, for the second time, "it's different because you're white," and that this was a question of "reverse discrimination."

187.     Smith was treating Ms. Shaw's complaint differently because of her skin color.

188.     Later, on June 30, 2020, Hunter emailed Ms. Shaw insisting on removing numerous examples of hostility from Shaw's internal grievance, because they were more about "climate."

189.     When Ms. Shaw objected, Hunter informed her that this was better addressed in a meeting with the VP of the Office of Equity and Inclusion and then refused to permit them in the complaint.

190.     On or about May 12, 2020, Shaw filed the second part of her internal complaint, documenting the racially hostile and discriminatory environment dating back to her time on the library staff.

24

**H.** **The Conditions at Smith Become Increasingly Intolerable**

191.    Following the death of George Floyd, Defendant Smith's practice of villainizing and stereotyping all white people based on race and creation of a racially hostile work environment for Ms. Shaw and other staff accelerated.

192.    On or about June 1, 2020, Shaw participated in the first 25 minutes of a "Generating Justice" event, which her supervisors strongly encouraged white staff to attend, with the implication being that non-attendance may be harmful to one's employment status or to the terms and conditions of employment at Smith.

193.    At the "Generating Justice" event, Smith's emcee told the audience that the voices of people of color must be prioritized and that white people had to take a "back seat."

194.    Following this event, the College sent out "resources" to Ms. Shaw and others with titles including "Dear White People, This is What We Want You to Do."

195.    The resources also invited Ms. Shaw and others to join one of the following "affinity groups": LGBTQ; Asian/Asian American; International; Black; Mixed Race; Latinx; or "White people committed to anti-racism."

196.    On or about June 4, 2020, College President Kathleen McCartney emailed all students, staff, faculty, and alums with a message segregating Americans into stereotypical racial categories of good and evil, victim and oppressor.

197.    President McCartney's message specifically maligned white people as singularly responsible for racism and stated, "[i]t is time to acknowledge that the work of anti-racism is white people's work."

198.     President McCartney followed up with another email on or about June 16, 2020 which again put the onus of racism and its consequences exclusively on whites by requiring only Ms. Shaw and other white (but not nonwhite) employees "to take actions to counter racism…".

199.     Around this time Defendant Durrant forwarded the Residence Life department an email from Dean Julie Ohotnicky ("Ohotnicky").

200.     Ohotnicky's email stated that "On June 10, 2020, I ask you to consider how you will stop business as usual and engage in some personal reflection and anti-racist work and learning."

201.     The email contained a link to #ShutDownAcademia, which stated "Those of us who are not black, **particularly those of us who are white, play a key role in perpetuating systemic racism…** Unless you engage directly with eliminating racism, you are perpetuating it." (emphasis added).

202.     On or about June 9, 2020, Defendant Durrant sent an email—only to white members of Shaw's department—convening a segregated meeting purportedly for the purpose of supporting "colleagues of color."

203.     Ms. Shaw did not respond to this email; however she knew (because Smith implied) that either not attending the segregated meeting, or expressing her reservations, would be framed as an act of aggression—a white "power-play"—and a violation of her undefined "cultural competency" work description, thus placing Ms. Shaw in ever more distress.

204.     Predictably, the following week at a pre-job performance review, Defendant Brown told Ms. Shaw that Brown did not feel Shaw had met the "mission and values of the department," in particular the area of "Cultural Competency."

205.    Shaw's September 30, 2020 and first and only performance review covered instances after the April 2019 to March 2020 period which supervisor Kia Brown said would be reviewed, and also covered the hectic COVID lockdown period, thus all but ensuring opportunities to select issues of concern, like "inconsistent performance."

206.    Present at the performance review was Hannah Durrant, despite being a named party in Ms. Shaw's internal complaint of discrimination.

207.    It was not Smith's standard practice to have an additional supervisor at performance reviews; therefore, Ms. Shaw objected to Durrant's presence at her review, and requested the review be recorded, which Ms. Brown rejected.

208.    "Cultural Competency" was omitted as a criterion of review.

209.    At Smith, "cultural competency" had become a euphemism for the endorsement of racial stereotyping and segregation that the school now practices.

210.    Brown noted Ms. Shaw's resistance during the race training session in January 2020 as an example of Plaintiff's deficient "cultural competency."

211.    In reality, Ms. Shaw has a degree (from Smith itself) in Cultural Anthropology.

212.    In July of 2020, Smith released a document entitled "Toward Racial Justice at Smith."

213.    Plaintiff sent an email to the VP of Human Resources, Anne Marie Szymt ("Szymt"), expressing concern over statements in the document that tied performance reviews and salary increases to an undefined commitment to "equity and inclusion," a Smith euphemism for its policies and practices that discriminate based on race, such as racially segregated housing.

214.    Smith also announced its intention to require further "cultural competency" training sessions, more of the same "training" of the sort in which Plaintiff had been singled out based on her race.

215.    Szymt ignored Plaintiff's requests to clarify the nature of the training despite repeated follow-up attempts.

216.    In the absence of guidance from Human Resources, Ms. Shaw met with VP of Equity and Inclusion, Cheung.

217.    During this meeting, Ms. Shaw expressed to Cheung her concern about her upcoming performance evaluation stating she did not know how one could effectively evaluate her based on concepts that the college refused to adequately define.

218.    Cheung then referred Shaw back to Human Resources and to Toby Davis, who said he was working on "definitions."

219.    Immediately following the meeting with Cheung, Ms. Shaw received an unsolicited email from Davis that said "Hello! Thank you for signing up to participate in the white accountability group for staff and faculty."

220.    Ms. Shaw responded to Davis stating that she had not expressed interest in signing up for the "White Accountability Group" and that she was simply seeking some definitions for certain nebulous terms which simultaneously weighed heavily on her performance evaluation and advancement at Smith.

221.    In response, Davis sent Plaintiff a link titled "Me and White Supremacy."

222.    On or about August 10, 2020 Defendant Durrant forwarded Residence Life staff encouraging them to attend another racially segregated panel hosted by Davis for "White Staff" on "what it means to be white."

I.      **Smith's Retaliatory Conduct Intensifies**

223.    Throughout the summer of 2020, Defendants Brown and Durrant incrementally took away more and more of Ms. Shaw's job responsibilities. purposefully excluding her from staff meetings, thus creating a situation in which Ms. Shaw was increasingly dependent upon Brown for all communication and failed to follow through with or include Shaw on important communications.

224.    This was done for the sole purpose of retaliating against Ms. Shaw by ensuring that her ability to do her job would be compromised.

225.    On August 10, 2020 Shaw sent an email to Brown informing her she no longer had access to enough information to be able to "confidentially and accurately convey policies and procedures" to students. Brown ignored the email as Shaw became increasingly cut off from Residence Life communications.

226.    All of Shaw's departmental colleagues when she joined Residence Life would soon receive promotions, and their job descriptions were changed, tailored by their own admission according to their respective individual talents and skills.

227.    When Brown threatened to remove some of Shaw's job responsibilities, Shaw asked her if she might have some input into the process. Brown responded that HR had told her the job should fit the department not the individuals. Such special treatment was reserved for Shaw again in retaliation for filing her internal complaint.

228.    Additionally, during this time Smith announced its intention to furlough staff.

229.    Smith made it clear that it would prioritize its race-based policies when deciding whom to furlough.

230.     Defendant Durrant told staff at a Residential Life staff meeting that she would try to exploit Residential Life's role in promoting race-based policies through its Residence Life Curriculum in order to keep staff from getting furloughed.

231.     On or about September 10, 2020, Smith placed Ms. Shaw on a half-time furlough; on information and belief, Plaintiff was the only full-time staff member of the Residence Life department to be placed on furlough.

232.     Later in September, , Defendants Durrant and Brown took away yet another one of Ms. Shaw's job responsibilities—housekeeping notifications-- without cause or justification; and without bothering to notify Shaw.

**J.      Retaliatory Investigation and Constructive Discharge**

233.     By late October 2020, it had been well over 100 days since Ms. Shaw submitted her internal complaint.

234.     Ms. Shaw emailed Hunter reminding her that she had told Ms. Shaw that the investigation would take 30-60 days.

235.     On October 16 Ms. Shaw informed Durrant via email that she was delaying the filing of any external EEOC complaints and retaliation claim until the original investigation was completed. Hunter never responded.

236.     Ms. Shaw asked Hunter if she had spoken to any of Ms. Shaw's named witnesses, an inquiry met with no reply of substance.

237.     On October 30 Shaw informed Durrant via email that it had been 100 days since she filed the internal complaint and that if she did not receive a response regarding a time certain time, she would proceed with an EEOC complaint.

238.    Frustrated by Smith's disregard for the racially hostile work environment and harassment its policies had created and after being slowly frozen out of more of her job responsibilities by her supervisors, Ms. Shaw posted a video to YouTube outlining her concerns with the racially hostile environment at Smith; the video went "viral" on the internet.

239.    Less than a week after Ms. Shaw released her video Hunter sent Ms. Shaw an email to discuss the outcome of the investigation.

240.    Hunter and Cheung informed Ms. Shaw that there was "insufficient evidence" to support a claim of a racially hostile work environment.

241.    The very same day, Residence Life sent out its weekly newsletter to students.

242.    This newsletter was entitled "A Guide to White Privilege," which told the reader not to "deflect" when talking about white privilege.

243.    The newsletter further scolded white people, stating that "Whiteness can be hard for white people to acknowledge and the self-victimization of white people is extremely harmful for Black people and people of color."

244.    In other words, Smith was expressly saying to Ms. Shaw and other employees that white people can never be permitted to object to racial hostility towards them.

245.    Smith's letter dismissing Ms. Shaw's complaints stated that the outside investigator had interviewed several people, including Ms. Shaw and the individuals she had named as respondents.

246.    However, on information and belief, none of the people Ms. Shaw had listed as witnesses to support her claims were interviewed.

247.    On or about November 2020 Ms. Shaw noticed she had been removed from being copied on Community Incident Report emails on which she had previously been included.

248.    Also in that time frame, Smith removed Ms. Shaw from campus wide safety alerts.

249.    This removal was during a time when Ms. Shaw was receiving lude messages and threats following the video she posted online.

250.    When Ms. Shaw inquired why materials regarding her were being taken off the community alert list—something that could impact Shaw's personal safety—Ms. Durrant inserted herself into the situation and denied Ms. Shaw's request for alerts and for more information.

251.    Subsequently, Ms. Shaw was invited to meet with Human Resources regarding what she thought would be a plan to discuss the threatening communications she had been receiving and how to ensure her safety.

252.    Ms. Shaw had requested the meeting after Dean of Students O'Hotnicky had convened a staff meeting on a day when Ms. Shaw was furloughed—thus purposefully excluding Ms. Shaw—to address threatening emails following the viral YouTube video.

253.    Rather addressing the lude and threatening emails directed at Ms. Shaw, the Human Resources meeting was instead a retaliatory "ambush."

254.    The HR employees who set up the meeting, Ohotnicky and HR staff member Kate Harrington ("Harrington"), interrogated Ms. Shaw about the YouTube video, Twitter postings, her feelings about students in the affinity houses, and revealed they were investigating Ms. Shaw's forwarding of work email to her personal account—which Ms. Shaw needed to prepare her internal complaint.

255.     Ms. Shaw was then immediately placed on administrative leave by Harrington, pending an "impact assessment" investigation, and lost all access to her emails and files which would support her retaliation claims against Smith.

256.     When Ms. Shaw asked Harrington to clarify exactly what she did wrong and why she was placed on leave Harrington only responded, "you should know."

257.     Defendants orchestrated a pretextual investigation against Ms. Shaw in direct retaliation for her objections to Smith's unlawful, racist policies and practices.

258.     During this period, Ms. Shaw learned that Defendant Durrant offered to meet any individuals—including people from outside the Smith community—who wished to discuss their demands that Ms. Shaw be fired, disciplined, and canceled at Smith for objecting to race-based campus orthodoxy.

259.     On or about January 31, 2021, following its pretextual investigation, Smith formally reprimanded Ms. Shaw.

260.     It was at this point that Ms. Shaw realized that the intolerable, racially hostile working conditions and unlawful retaliation at Smith would only get worse and would not improve.

261.     Having no other reasonable choice, Shaw made the difficult decision to resign from her position at Smith, her alma mater, on February 19, 2021.

262.     Any reasonable person in Ms. Shaw's position would have felt compelled to resign and would have resigned.

263.     At all times during her employment with Smith, Ms. Shaw was qualified for the positions and capacities in which she was employed.

264.     Ms. Shaw's work performance with Smith was at all times excellent and met or exceeded the expectations of Smith.

265.     On February 25, 2021, Ms. Shaw filed a timely Complaint and Charge of Discrimination against Smith with the Massachusetts Commission Against Discrimination (the "MCAD") and the Equal Employment Opportunity Commission ("EEOC").

266.     In the Complaint filed with the MCAD and EEOC, Ms. Shaw alleged that Smith discriminated against her on the basis of race and retaliated against her for reports and complaints of discrimination.

267.     The MCAD notified Smith of Mr. Shaw's complaint of discrimination, investigated the complaint, and provided Smith with an opportunity to conciliate the matter; thus, Ms. Shaw satisfied all administrative agency filing perquisites to this action.

268.     The EEOC issued Ms. Shaw a Notice of Right to Sue on or about September 21, 2021.

**COUNT 1 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981
(UNLAWFUL RACIAL DISCRIMINATION AND CONSTRUCTIVE DISCHARGE)**
(against Smith College)

269.     Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

270.     Throughout the course of Plaintiff's employment Smith College treated Plaintiff differently because of her race. Smith College also required Plaintiff to treat coworkers and the students in her care differently based upon their race, in violation of state and federal law.

271.     Defendant's invidious race discrimination adversely affected the terms, conditions, and privileges of Plaintiff's employment by, inter alia, depriving her of an opportunity to compete equally for a job opening and telling Plaintiff it was "because you are white," forcing Plaintiff to assume a position with lower pay and opportunity for advancement; requiring Plaintiff, as a condition of her employment, to discriminate against white students because of their race; racially segregating employees during work-related functions; hindering Plaintiff's attempt to file an internal complaint of discrimination and then treating the complaint differently because Plaintiff is white; placing Plaintiff on furlough, taking away most of her job responsibilities, freezing her out of vital work-related communications and meetings, and subjecting her to a retaliatory investigation and reprimand due to her race.

272.     Defendant's discriminatory conduct created an intolerable working environment for Plaintiff, leading to her constructive discharge.

273.     As a further direct and proximate result of said unlawful employment practices Plaintiff suffered the indignity of discrimination and invasion of her right to be free from discrimination.

274.     As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

275.     As a further direct and proximate result of said unlawful employment practices, Plaintiff was compelled to resign her position with Smith, as any reasonable person would have, and thus suffered the loss of her job as a result of a constructive discharge.

276.     Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous

disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

### COUNT 2 – VIOLATION OF 42 U.S.C. § 1981
### (UNLAWFUL RACIAL DISCRIMINATION)
(against Brown and Durrant)

277.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

278.    Throughout the course of Plaintiff's employment Defendants treated Plaintiff differently because of her race. Defendants also required Plaintiff to treat coworkers and the students in her care differently based upon their race, in violation of state and federal law.

279.    Defendants' invidious race discrimination adversely affected the terms, conditions, and privileges of Plaintiff's employment by, inter alia, requiring Plaintiff, as a condition of her employment, to discriminate against white students because of their race; racially segregating employees during work-related functions; punishing Plaintiff for objecting to humiliating and demeaning racial struggle sessions she was forced to attend; attempting to frustrate Plaintiff's attempt to file an internal complaint of discrimination; taking away most of Plaintiff's job responsibilities, freezing her out of vital work-related communications and meetings, and subjecting her to a retaliatory investigation and reprimand due to her race.

280.    Defendants' discriminatory conduct created an intolerable working environment for Plaintiff, leading to her constructive discharge.

281.    As a further direct and proximate result of said unlawful employment practices Plaintiff suffered the indignity of discrimination and invasion of her right to be free from discrimination.

282.     As a further direct and proximate result of said unlawful employment practices,

Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation,

embarrassment, and fear.

283.     Defendants' discriminatory and unlawful employment practices identified in this

complaint have been intentional, deliberate, willful, systematic, and conducted in callous

disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to

compensatory and punitive damages.

**COUNT 3 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF
1964 (42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981
<u>(UNLAWFUL RACIAL HARASSMENT/HOSTILE ENVIRONMENT)</u>**
(against Smith College)

284.     Plaintiff repeats and realleges each of the foregoing allegations in this Complaint

as if fully set forth herein.

285.     Smith College subjected Plaintiff to a racially hostile work environment from July

2018 until she was constructively discharged in February 2021.

286.     During this period Defendant's policies and practices created a working

environment heavily charged with racial discrimination and intimidation.

287.     In particular and as described above, Smith College permitted – and even

encouraged – non-white students and employees to racially abuse and harass white students and

employees due to their race; required white employees, including Plaintiff, to verbally flagellate

themselves during racial struggle sessions; subjected employees, including Plaintiff, to different

disciplinary and behavioral standards based on race; instituted hiring and promotion practices

that explicitly discriminated against white individuals; segregated students and employees by

race; and inundated Plaintiff and other employees with mandatory trainings, policies, and

communications that engaged in, and were permeated with, noxious and demeaning racial stereotypes – all of which served to single out Plaintiff for racial insult and humiliation.

288.    Plaintiff reported the discriminatory conduct, verbally and in writing, to Defendant. Despite being aware of the hostile environment, however, Defendant failed to ameliorate it in any way and, in fact, doubled-down on its efforts to create a more racially hostile environment.

289.    As a further direct and proximate result of said unlawful employment practices Plaintiff suffered the indignity of discrimination and invasion of her right to be free from discrimination.

290.    As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

291.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

### COUNT 4 – VIOLATION OF 42 U.S.C. § 1981
### (UNLAWFUL RACIAL HARASSMENT)
(against Brown and Durrant)

292.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

293.    Defendants subjected Plaintiff to a racially hostile work environment from the time they became her supervisors until she was constructively discharged in February 2021.

294.    In particular and as described above, Defendants required Plaintiff to attend humiliating and demeaning racial struggle sessions and retaliated against Plaintiff when she objected; subjected Plaintiff to different disciplinary and behavioral standards based on race; instituted hiring and promotion practices that explicitly discriminated against white individuals; segregated students and employees by race; required Plaintiff, as a condition of her employment, to treat students under her care differently based on their race; and inundated Plaintiff and other employees with mandatory trainings, policies, and communications that engaged in, and were permeated with, noxious and demeaning racial stereotypes – all of which served to single out Plaintiff for racial insult and humiliation.

295.    As a further direct and proximate result of said unlawful employment practices Plaintiff suffered the indignity of discrimination and invasion of her right to be free from discrimination.

296.    As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

297.    Defendants' discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

### COUNT 5 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981 (RETALIATION)
(against Smith College)

298.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

299.    When Plaintiff complained about Smith College's racially discriminatory policies, practices, and hostile environment Defendant retaliated against her for her protected civil rights activity.

300.    Defendant, in an effort to dissuade Plaintiff from continuing to speak out about the discrimination and harassment at Smith College, gave Plaintiff a negative performance review, placed Plaintiff on a furlough (the only Residence Life employee subjected to this treatment), took away most of her job responsibilities, froze her out of vital work-related communications and meetings, and subjected her to a pretextual investigation.

301.    Defendant's discriminatory conduct created an intolerable working environment for Plaintiff, leading to her constructive discharge.

302.    As a further direct and proximate result of said unlawful employment practices Plaintiff suffered the indignity of discrimination and invasion of her right to be free from discrimination.

303.    As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

304.    As a further direct and proximate result of said unlawful employment practices, Plaintiff was compelled to resign her position with Smith, as any reasonable person would have, and thus suffered the loss of her job as a result of a constructive discharge.

305.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

40

## COUNT 6 – VIOLATION OF 42 U.S.C. § 1981
## (RETALIATION)
### (against Brown and Durrant)

306.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

307.    When Plaintiff complained about Smith College's racially discriminatory policies, practices, and hostile environment Defendants retaliated against her for her protected civil rights activity.

308.    Defendants, in an effort to dissuade Plaintiff from continuing to speak out about the discrimination and harassment at Smith College, gave Plaintiff a negative performance review, took away most of her job responsibilities, froze her out of vital work-related communications and meetings, and subjected her to a pretextual investigation.

309.    Defendant's discriminatory conduct created an intolerable working environment for Plaintiff, leading to her constructive discharge.

310.    As a further direct and proximate result of said unlawful employment practices Plaintiff suffered the indignity of discrimination and invasion of her right to be free from discrimination.

311.    As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

312.    Defendants' discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

313.     Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

314.     From July 2018 until her resignation in February 2021, Defendants subjected Plaintiff to a racially hostile work environment.

315.     In particular and as described above, Plaintiff – as a condition of her employment – was continually barraged with training materials that were permeated with noxious and demeaning racial stereotypes. When she objected to participating in trainings that required her not only to endure but also to actively participate in this racial stereotyping, she was singled out for insult and humiliation.

316.     Plaintiff reported the discriminatory conduct, verbally and in writing, to numerous employees of Defendant Smith College, including Defendants Brown, Durrant, and Hunter. Despite being aware of the hostile environment, however, Defendants failed to ameliorate it in any way.

317.     Because of Defendants' actions, Plaintiff suffered emotional harm, direct damages, and indirect damages in an amount to be determined at trial.


### COUNT 7 – VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
(42 U.S.C. §2000d *et seq.*)
(INTENTIONAL DISCRIMINATION)
(against all defendants)

318.     Shaw repeats and realleges each of the prior allegations in this complaint.

319.     Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

320.     Because Smith College receives federal financial assistance,[2] it is subject to Title

VI's prohibitions. *See* 42 U.S.C. §2000d-4a.

321.     Smith College promotes and sponsors racially segregated student housing: a black

affinity house and a students-of-color affinity house.

322.     Beginning 2019 and continuing throughout 2020, Smith College and all

defendants intentionally discriminated against Shaw and staff by making them aid and abet it's

racially segregated housing policy, causing Shaw distress and professional harm.

323.     When there were dormitory beds available in affinity houses but not elsewhere,

white students did not have dormitory beds.

324.     Smith College moved white students out of dormitories in order to make way for

racially segregated housing.

325.     Smith College removed all artwork by white artists in the black and brown

affinity houses because the artists are white.

326.     Smith College and all defendants subjected Shaw, staff and students to

discrimination in the form of racial segregation, treating students and staff differently because of

their race and creating an environment where it was reasonable to assume white people were

excluded from black and brown affinity houses because of their skin color.

327.     Smith College's racially segregated housing policy on its face and as applied

violates Title VI of the Civil Rights Act.

328.     Private individuals may sue to enforce Title VI and obtain injunctive relief and

damages. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

---

[2] https://facdissem.census.gov/Main.aspx

## COUNT 8 – VIOLATION OF M.G.L. CHAPTER 151B, SECTION 4
## (<u>RACE DISCRIMINATION AND CONSTRUCTIVE DISCHARGE</u>)
(against all defendants)

329.    Plaintiff restates, realleges and incorporates by reference herein the allegations contained in the preceding paragraphs as if recited in full herein.

330.    Smith and the other defendants in this action unlawfully discriminated against the plaintiff and created a racially hostile environment because of and on account of her race in violation of Massachusetts General Laws Chapter 151B, Section 4.

331.    As a further direct and proximate result of said unlawful employment practices, Plaintiff was compelled to resign her position with Smith, as any reasonable person would have, and thus suffered the loss of her job as a result of a constructive discharge.

332.    As a direct and proximate result of Smith's unlawful race discrimination and racially hostile work environment, in violation of M.G.L. Chapter 151B, Section 4, the plaintiff has suffered substantial economic damage including losses of past and future wages, earnings, earning capacity, salary and fringe benefits, and has suffered emotional distress and anguish of mind, and has suffered, and will continue to suffer, other damages as she will show at trial.

333.    Plaintiff complied with the requirement(s) of Massachusetts General Laws Chapter 151B, Section 5 when she properly and in a timely manner filed a complaint with the MCAD, said complaint alleging that Smith subjected her to unlawful race discrimination.

334.    More than ninety days have passed since Plaintiff filed a Complaint with the MCAD.

335.    The MCAD has authorized the plaintiff to bring this private cause of action.

336.    Massachusetts General Laws Chapter 151B, Section 9 authorizes Plaintiff to bring this private civil action against Smith

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment against SMITH and:

a. Declare that SMITH's conduct violated Massachusetts General Laws Chapter 151B, Section 4, as amended;

b. Enjoin SMITH from subjecting the plaintiff to discrimination;

c. Issue a mandatory injunction compelling SMITH to provide training to its agents, employees and officers designed to eliminate, prevent and reduce discrimination;

d. Award Plaintiff compensatory damages;

e. Award Plaintiff punitive damages;

f. Award Plaintiff reasonable attorneys' fees, statutory interest, and the costs of this action;

g. Issue such other relief as the Court deems just and proper.

### COUNT 9 – VIOLATION OF M.G.L. CHAPTER 151B, SECTION 4 (RETALIATION)
(against all defendants)

337.     Plaintiff restates, realleges and incorporates by reference herein the allegations contained in the preceding paragraphs as if recited in full herein.

338.     SMITH unlawfully retaliated against the plaintiff because of and on account of her report and complaint of race discrimination and hostile environment in violation of Massachusetts General Laws Chapter 151B, Section 4.

339.     As a further direct and proximate result of said unlawful employment practices, Plaintiff was compelled to resign her position with Smith, as any reasonable person would have, and thus suffered the loss of her job as a result of a constructive discharge.

340.     As a direct and proximate result of SMITH's unlawful retaliation in violation of M.G.L. Chapter 151B, Section 4, the plaintiff has suffered substantial economic damage

including losses of past and future wages, earnings, earning capacity, salary and fringe benefits, and has suffered emotional distress and anguish of mind, and has suffered, and will continue to suffer, other damages as she will show at trial.

341.    Plaintiff complied with the requirement(s) of Massachusetts General Laws Chapter 151B, Section 5 when she properly and in a timely manner filed a complaint with the MCAD, said complaint alleging that SMITH subjected his to unlawful retaliation.

342.    More than ninety days have passed since Plaintiff filed a Complaint with the MCAD.

343.    The MCAD has authorized the plaintiff to bring this private cause of action.

344.    Massachusetts General Laws Chapter 151B, Section 9 authorizes Plaintiff to bring this private civil action against SMITH.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment against SMITH and:

a.  Declare that SMITH's conduct violated Massachusetts General Laws Chapter 151B, Section 4, as amended;

b.  Enjoin SMITH from subjecting the plaintiff to retaliation;

c.  Issue a mandatory injunction compelling SMITH to provide training to its agents, employees and officers designed to eliminate, prevent and reduce discrimination and retaliation;

d.  Award Plaintiff compensatory damages;

e.  Award Plaintiff punitive damages;

f.  Award Plaintiff reasonable attorneys' fees, statutory interest, and the costs of this action;

g.  Issue such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   General and compensatory damages for Plaintiff for the violations of her state and federal constitutional and statutory rights, and emotional distress, all according to proof.

B.   Punitive damages, according to proof.

C.   Preliminary and permanent injunctive relief:

1.   Preliminary and permanent injunctive relief requiring Defendants, their successors in office, agents, employees, and assigns, and all persons acting in concert with them, to eliminate any and all policies, customs, and/or practices at Smith College that single out, segregate, scapegoat, or stereotype "white people" or any other race. This includes, but is not limited to:

   i.   Eliminating "affinity houses" at Smith College that segregate students based on race or other protected characteristics.

   ii.   Eliminating racially discriminatory training, seminars, retreats, or any other job-related functions that accuse white employees of—or requires them to admit to—white supremacy, white privilege, racism, or any other characteristic, trait, or behavior, solely based on the color of their skin.

   iii.   Eliminating any policy or practice that determines job-related functions for any employee based on race.

   iv.   Eliminating any policy or practice that requires employees, as a condition of employment, to treat students differently based on race or any other protected characteristic.

   v.   Eliminating any policy or practice that discriminates, or gives preferential treatment to individuals, based on race in recruiting, hiring, promotion, and other terms and conditions of employment.

      F.       Attorneys' fees, costs, interest, and expenses pursuant to 42 U.S.C. §1988,

M.G.L. Chapter 151B and other relevant statutes.

      G.      And such other and further relief as the Court may deem proper.


Respectfully submitted,
For the plaintiff,


/s/     Sol J. Cohen           
Sol J. Cohen
BBO # 630776
KERSTEIN, COREN & LICHTENSTEIN, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
(781) 997-1600
e-mail: scohen@kcl-law.com

/s/     David Pivtorak           
David Pivtorak
THE PIVTORAK LAW FIRM
611 Wilshire Blvd., Ste 325
Los Angeles, CA 90017
(213) 291-9130
e-mail: david@piv4law.com

*Pro Hac Vice* application forthcoming


/s/ Jonathan O'Brien
Jonathan O'Brien, Esq.
Law Office of Jonathan O'Brien
200 Park Avenue, Suite 1700
New York, NY 10166
ph: 610-368-2988
e: jobrien@burnsobrienlaw.com
*Pro Hac Vice* application forthcoming

# EXHIBIT A









# EXHIBIT B

## AFTERNOON WORKSHOPS

### 3:15–4:45 P.M.

### A Conversation With Deborah Archer
*Moderated by Floyd Cheung*
*Leo Weinstein Auditorium, Wright Hall*

### Why Is It So Difficult for White People to See and Understand Racism and White Supremacy?
*Joshua Miller, professor of social work*
The United States was founded on a racial contract that included genocide, ethnic cleansing and enslavement; white supremacy is in the DNA of the country. It continues to be manifested in many ways—structurally, institutionally, culturally, interpersonally, politically and in the ways that people internalize beliefs, feelings and ways of seeing the world. People of color are all too familiar with the many manifestations of white supremacy, but white people are often unaware of the extent and depth of modern-day racism and their white racial privileges, or are in denial, defensive or even believe that they are victims of "reverse racism." How is this possible, why does it occur and what can be done to help white people to fully engage as antiracism activists?
*Leo Weinstein Auditorium, Wright Hall*

### If I Commit a Racial Microaggression, Does That Mean I'm a Racist?
*Shannon Audley, associate professor of education and child study; Nnamdi Pole, professor of psychology*
Through discussion and exercises, this workshop will help faculty identify when they commit racial microaggressions and determine how best to respond to these in various contexts. Considering microaggressions from an individualist approach, this workshop will center around power and racial microaggressions within institutional roles with professors. We will use a framework that refrains from placing blame on racist identities and instead examines the behavior itself and its outcomes, regardless of intention. This will allow us to focus more broadly on the various institutions at play when microaggressions are committed and to explore the various power roles that professors and students negotiate within these structures.
*Seelye Hall 201*

### Documenting Discrimination and Protest (Smith College Archives)
*Madison Whiten and Nanci Young, archivists*
The Smith College Archives is looking for student and community input about how we document protest on campus. Share your ideas about what we should collect, how we should document hate speech and discrimination on campus, strategies for documenting social justice and protest communities, and ways we can continue to use protest history for accountability and further change. We will also display some archive materials about past Smith protests, so come take a look!
*Seelye Hall 101*

### Can Virtual Reality and Video Games Foster Empathy? Hands-on Demo
*Dan Bennett, Yasmin Eisenbauer, Travis Grandy, Mario Valdebenito—Information Technology Services; Andrew Maurer—art department; Arris Moise '22 and Rebecca Wolf '20*
Virtual reality is a powerful and emerging medium that enables viewers to step into real and imagined worlds, including those that feature stories of culture and identity. In 2015, VR was characterized as "the ultimate empathy machine." Embodying the bodies, lives and spaces of others can be compelling, but can it really foster empathy? Drop in and explore interactive gaming; 360° videos; and *1000 Cut Journey*, an immersive virtual reality film. Curated content centers on the stories of people of color, trans people and people with disabilities. Bring your mobile phones and headsets to download/experience mobile VR content (a limited number of devices will be available).
*Campus Center 103–104*

### Calling In Otelia: What Creating an Inclusive Campus Can Look Like a Century Later
*Loretta Ross, visiting associate professor of the study of women and gender*
Otelia Cromwell faced both support and discrimination at Smith College. What can we learn and share 100 years later about erasing the vestiges of white supremacy at Smith? This workshop will discuss the politics of inclusion through a calling-in lens to create a beloved community for everyone.
*Graham Hall, Brown Fine Arts Center*

### Race and the Environment: To What Extent Can Building Resilience to Climate Change Help Establish Environmental Justice?
*Camille Washington-Ottombre, assistant professor of environmental science and policy*
Forty years after the birth of the environmental justice movement, minorities continue to be marginalized and are exposed to polluted neighborhoods, food deserts and exploitative jobs in the fossil fuel industry, among other inequities. While extreme weather events become more frequent, the environmental injustices of communities of color are only projected to worsen. Yet for the first time, local planning and policy efforts to combat and mitigate climate change seem to be working to address those injustices. How are building resilience to climate change and issues of environmental justice related?
*McConnell Hall 103*

# EXHIBIT C

# Why is it so difficult for white people to see and understand racism and white supremacy?

And what to do about it.

Joshua Miller, Ph.D.

Professor, Smith College

School for Social Work

jlmiller@smith.edu





Most ideas taken from Chapter 5….

# Today's Presentation

- Spectrum and web of racism
- Possible explanations for why it is so difficult for white people to see and understand racism and white supremacy.
- Working with stereotypes that underpin implicit racism
- How white people can be allies in the struggle against racism and white supremacy.

Elizabeth Eckford desegregating Central High School Little rock



This Photo by Unknown Author is licensed under CC BY-ND

# Little Rock Nine



# Why?

Do a majority of white people dismiss the fact that African Americans and other black people and LatinX people face discrimination when trying to get well-paying jobs?  (Bobo)

Do a majority of white people think that so-called "reverse racism" is a bigger problem than racism against people of color?  (Norton and Summers)

Do so many white people believe in "color-blindness" when we live in a society that is never color blind?

# The Racial Contract-Charles Mills

## The Social Contract

- All people have rights, e.g. liberty, equality, happiness

## The Racial Contract

- People socially constructed as not white are not considered fully human, can be the targets of genocide, enslavement, apartheid, ethnic cleansing, immigration exclusion, linguistic and cultural exclusion, stereotypes, aggressions and microaggressions, assaults, incarceration, etc.
- The racial contract not only became "normal" but eventually invisible to those who benefited from it.

# The Spectrum of Racism and White Supremacy



# Web of Institutional Racism



*Connecting lines are arbitrary and for illustration; in reality, each form of institutional racism connects with each other form in multiple ways.*

# Why is it so hard for white people to see this?

- Overtly white supremacist beliefs

- Fears and projections.

- Sense of victimization – "I am discriminated against, my needs are not being met, I don't feel privileged."

- But in many instances, white people's values are consciously against racism.

# Why is it so difficult? (continued)

- There is a mixture of:
- ignorance,
- lack of awareness,
- limited exposure,
- reduced empathy and often disbelief or minimizing,
- self-protection and avoidance of unpleasant feelings,
- distorted vision and thinking,
- living in "white bubbles,"
- socialization and reinforcement, normalizing the way things are.

# Some major barriers

Not seeing and perceiving white supremacy and racism

Not comprehending or recognizing.

Avoiding – disturbing feelings and thoughts – confusion, cognitive dissonance, anger, shame, guilt, sadness

Not caring enough to invest and work on this.

Fearing what is different and unfamiliar, or of talking about it. What if I make a mistake?

Assuming that what one has been taught and experienced is true and real for everyone.

Obfuscations and Distortions – e.g. mythologies about individual effort and achievement, segregation, justifying discourses

Minimizing, mansplaning, whitesplaning

Defensiveness – fear of not feeling good about oneself or being a bad person ("white fragility" DiAngelo)

Anais Nin – "We don't see things as they are; we see them as we are."



# Racism is so Familiar it appears to be "Normal" to many White people

- It is as if it is in the air people breathe
- It is reinforced by institutions, socialization and public discourses which legitimizes it
- These external factors become part of people's cognitive maps
- Many people of color learn to anticipate racism while white people carry an "invisible knapsack" of racial privilege, while living in denial of this

# Consciousness - Damasio

Consciousness has two componenents;

1. Awareness of self as an actor – author and reader of self-narratives that  constitute self-awareness

2. Awareness of people, objects, forces outside of ourselves.

Given this, people of color are more likely to have a consciousness about race and racism

- People of color are more likely to have had a sense of conscious racial awareness and identity from an early age from family values and lessons learned about navigating a racist world.

- There is likely to be greater dissonance between their social identities and the lack of mirroring from the social world, as well as encroachments, while white people are more likely to find that their social world mirrors them.

- Ojiaku (2016) has found that people of color have less implicit bias than white people and are therefore more likely to have empathy for all people, regardless of racial identity.

Thus



For example, white writers are seen as "writers" not writers who write about white topics for white people; compared to Asian American, African American, LatinX and Native American writers.

People of color are more likely to be aware of both racism and themselves as racialized actors in a world of white supremacy.

And they are more likely to believe that their lives reflect individual effort and achievement rather than seeing that much of their success was also due to structural social advantages.

Many white people move through a world that mirrors their centrality and believe that they and the world are deracinated — that they are "just people" or "Americans."

White people are more likely to see themselves as individuals rather than members of groups.

# Two Useful Theories

Social Norm Theory – People are categorized into rigid, essentialist groups.  Social norms reflect those practices that legitimize group dominance by the group in power – e.g. those socially  constructed as white.  This culturally and mentally "normalizes" white supremacy and is reflected externally in cultural symbols, teaching, books, the media but also colonizes people's minds and is manifested through assumptions about what is "normal", stereotypes, microaggressions, etc.

Group Dominance Theory – Groups in power (those socially constructed as white) will hoard, mobilize and control resources to their advantage.  Examples of this are neighborhoods where people live and what resources are available or not available in those neighborhoods, controlling economic resources, political resources, policing power to enforce group dominance, who teaches in universities and which books are used, access to elite colleges, etc.

# Reinforcing the invisibility of whiteness



| Growing | Growing up in a predominantly white neighborhood |
| Attending | Attending a predominantly white school |
| Encountering | Encountering mostly white administrators, teachers, etc. |
| Seeing | Seeing mostly white actors in films and television who are not viewed as starring in "genre" works. |

# Reinforcing racial awareness and consciousness for People of Color

- If growing up in a homogenous community, noticing contrasts when communities are portrayed in the media or when leaving the community.  Perhaps noticing disparities between neighborhoods in resources.

- If growing up in a racially/ethnically diverse community, often finding that one is literally in a minority or even when in the majority, referred to as being "minority."

- Encountering racial stereotypes, implicit and explicit bias, threats, microaggressions.

- Perhaps having to show identification when shopping or being followed in stores, being pulled over by the police, noticing higher rates of detention in schools, etc.



# Elizabeth Eckford

- ""My mother taught me to treat white people like wild animals – don't make eye contact, no sudden movements."

## Damasio – Part II

- People strive for a homeostatic state when they encounter phenomena that stirs them up.

- Confronting the reality of racism may stir up a great deal of cognitive dissonance, particularly with one's values and conscious beliefs

- Affectively may experience confusion, fear of saying or doing the wrong thing, guilt, shame…

- Which may lead to denial, minimizing, defensiveness

- And cognitive distortions: Bonilla Silva "It is easier to believe in cultural differences than structural advantages and disadvantages."

# Consequences

- Projecting parts of oneself onto members of another group.  E.g. – fearful white police officers viewing young African American men and children carrying cell phones as dangerous.

- Accentuating the positive or minimizing the extent of white supremacy: "we are passed that," focusing on the words of the "founding fathers" rather than their deeds, actions and the reality of how they lived.

- Negation, dismissal, avoidance of considering, talking about or confronting racism.  "I already know about this."

Implicit (Banaji & Greenwald) and AVERSIVE RACISM (Dovidio & Gaertner)

"Subtle, often unintentional and unconscious biases and stereotypes

Did experiments with eye contact and blinking, which are usually below the radar screen of consciousness and found racial differences. Less empathy when white people view pain being experienced by people of color.

# AVERSIVE RACISM (Cont.)

In the US, most whites who engage in this have strong egalitarian values and believe that they are not prejudiced – will not openly discriminate, rather will do so unintentionally

All of this leads to social situations where whites may think that interactions are going well, due to their explicit attitudes and conscious reactions, while people of color may feel they are not, as they pick up implicit attitudes and unconscious reactions.



# MICROAGRRESSIONS (Pierce; Solorazano, et al.

- Chester Pierce – "subtle, stunning, often automatic, and non-verbal exchanges which are 'put downs' of blacks by offenders." – "stunning, automatic acts of disregard that stem from unconscious attitudes of white superiority and constitute a verification of black inferiority."

- Solorzano, Ceja & Yosso studied the impact of these interactions on predominantly white college campuses

# MICROAGGRESSIONS (Cont.)

Examples of microaggressions – feeling invisible or ignored, denying relevance of race and racism, being treated with low expectations, being mistrusted, feeling stereotyped, having to speak for one's race, minimizing of racism and racist symbols and language

Consequences – being wary and mistrustful, feeling tired and discouraged, stereotype threat

In response – creating counter-spaces, safe havens, cultures of solidarity and resistance.



# The Persistence of Stereotypes

- Racism is more than stereotypes – it is institutional, reflects opportunity, access, power and privilege differentials but for white people, working with stereotypes is a critical part of working against racism.

- Most stereotypes are learned through socialization by families, respected teachers. Many stereotypes are echoed and mirrored by culture and the media.

- The cognitive dissonance between the overt (ideals and values)and covert is difficult to tolerate.

- There are strong feelings of guilt, shame, denial, anger, which are inhibiting.

# From stereotypes to stereotype threat (Miller & Garran)



## Confronting Stereotypes

- Dissonance with beliefs
- Perspective taking and individuation
- Replacement thoughts
- Social support
- Self affirmation and validation
- Practice, patience, gentleness

# Stereotype Exercise

Think of a stereotype

What triggered it? When you notice it what do you feel?

Where do you think you learned this stereotype?

What in society perpetuates this stereotype?

What do you know or believe that contradicts this stereotype?

# Obligation to Confront Racism?

- What obligation do white people have to confront racism and white supremacy?

- Is anyone exempt?  If so, who?

- Ervin Staub – terrible crimes against groups of people happen because the majority of people who are not targeted are passive bystanders.

- If a white person is against racism, what can they do?

# Challenges to Dismantling Racism



# Realms of Engagement

 Intrapersonal – racism is inside of people

 Interpersonal – racism is between people

 Organizational – racism is structured in organizations, such as schools, businesses. Conduct an organizational audit focusing on racism.

 Institutional – racism is structured in laws, policies, social patterns

 Ideological/Representational – racism is discursive, symbolic, and signified in a multitude of public sites and discourses

# The Web of Resistance (Werkmeister Rojas and Miller}



# Conclusion

- Racism and white supremacy are pervasive and part of the DNA of the United States.

- While white people have consistently worked to maintain this system of power, privilege and oppression, there have also always been some white people who have worked against it.

- Elizabeth Eckford was deeply wounded by her experiences when integrating Little Rock High School and she re-experiences that trauma by talking to white people about what happened.

- When asked why, she responds that it is her way of continuing her activism, to help raise people's awareness and hopefully enlist them in allies in this ongoing struggle.

## Martin Luther King Jr.

- He who passively accepts evil is as much involved in it as he who helps to perpetuate it. He who accepts evil without protesting against it is really cooperating with it.

- The ultimate tragedy is not the oppression and cruelty by bad people but the silence over that by the good people.

- We cannot walk alone.

# If you would like a copy of the slides, contact me: jlmiller@smith.edu



# EXHIBIT D

**Designing a Racist Community**

Objectives:
1. To identify the key elements of racism.
2. To discover how racism functions in society.

Materials:
1. Flip-Chart paper
2. Markers
3. Masking tape

Process:
1. Divide the participants into groups of four to six persons. Give each group easel paper and markers.
2. Ask the groups to design a racist community or organization. Have each group describe its community or organization on the paper. It can be blatantly or subtly racist. Ask the groups to make sure they describe the following
   a. The makeup of the community or organization
   b. Who makes decisions.
   c. How the decisions are made.
   d. Who has control of money
   e. Who establishes the formal policy of the community or organization.
   f. Who establishes the informal policy of the community or organization.
   g. The roles of various institutions of the community – schools/colleges, churches, businesses, media, social organizations, recreational facilities or the various structures of the organization – and the roles that individuals and groups play.
3. Post the papers and ask each group to share its community or organization with the whole group.

Source: Katz, J. H. (2003). *White Awareness: Handbook for Anti-Racism Training*. Norman: The University of Oklahoma Publishing.

# EXHIBIT E

*[handwritten: No clarification + explanation]*

# THE CHARACTERISTICS OF WHITE SUPREMACY CULTURE

*[handwritten: Supremacy? As opposed to just "supremacy" in general — ways any-body or group may be]*

*From Dismantling Racism: A Workbook for Social Change Groups,*
*by Kenneth Jones and Tema Okun, ChangeWork, 2001*

*[handwritten: have ..]*

Below is a list of characteristics of white supremacy culture which show up in our organizations. Culture is powerful precisely because it is so present and at the same time so very difficult to name or identify. The characteristics listed below are damaging because they are used as norms and standards without being pro-actively named or chosen by the group. They are damaging because they promote white supremacy thinking. They are damaging to both people of color and to white people. Organizations that are people of color-led or a majority people of color can also demonstrate many damaging characteristics of white supremacy culture.

## Perfectionism

- little appreciation expressed among people for the work that others are doing; appreciation that is expressed usually directed to those who get most of the credit anyway
- more common is to point out either how the person or work is inadequate
- or even more common, to talk to others about the inadequacies of a person or their work without ever talking directly to them
- mistakes are seen as personal, i.e. they reflect badly on the person making them as opposed to being seen for what they are -- mistakes
- making a mistake is confused with being a mistake, doing wrong with being wrong
- little time, energy, or money put into reflection or identifying lessons learned that can improve practice, in other words little or no learning from mistakes
- tendency to identify whatís wrong; little ability to identify, name, and appreciate whatís right

**Antidotes**: develop a culture of appreciation, where the organization takes time to make sure that peopleís work and efforts are appreciated; develop a learning organization, where it is expected that everyone will make mistakes and those mistakes offer opportunities for learning; create an environment where people can recognize that mistakes sometimes lead to positive results; separate the person from the mistake; when offering feedback, always speak to the things that went well before offering criticism; ask people to offer specific suggestions for how to do things differently when offering criticism

## Sense of Urgency *[handwritten: ?]*

- continued sense of urgency that makes it difficult to take time to be inclusive, encourage democratic and/or thoughtful decision-making, to think long-term, to consider consequences
- frequently results in sacrificing potential allies for quick or highly visible results, for example sacrificing interests of communities of color in order to win victories for white people (seen as default or norm community)
- reinforced by funding proposals which promise too much work for too little money and by funders who expect too much for too little

**Antidotes**: realistic workplans; leadership which understands that things take longer than anyone expects; discuss and plan for what it means to set goals of inclusivity and diversity, particularly in terms of time; learn from past experience how long things take; write realistic funding proposals with realistic time frames; be clear about how you will make good decisions in an atmosphere of urgency

### Defensiveness

- the organizational structure is set up and much energy spent trying to prevent abuse and protect power as it exists rather than to facilitate the best out of each person or to clarify who has power and how they are expected to use it
- because of either/or thinking (see below), criticism of those with power is viewed as threatening and inappropriate (or rude)
- people respond to new or challenging ideas with defensiveness, making it very difficult to raise these ideas
- a lot of energy in the organization is spent trying to make sure that people's feelings aren't getting hurt or working around defensive people
- the defensiveness of people in power creates an oppressive culture

**Antidotes**: understand that structure cannot in and of itself facilitate or prevent abuse; understand the link between defensiveness and fear (of losing power, losing face, losing comfort, losing privilege); work on your own defensiveness; name defensiveness as a problem when it is one; give people credit for being able to handle more than you think; discuss the ways in which defensiveness or resistance to new ideas gets in the way of the mission

### Quantity Over Quality

- all resources of organization are directed toward producing measurable goals
- things that can be measured are more highly valued than things that cannot, for example numbers of people attending a meeting, newsletter circulation, money spent are valued more than quality of relationships, democratic decision-making, ability to constructively deal with conflict
- little or no value attached to process; if it can't be measured, it has no value
- discomfort with emotion and feelings — How one feels about their own emotion/feelings can
- no understanding that when there is a conflict between content (the agenda of the meeting) and process (people's need to be heard or engaged), process will prevail (for example, you may get through the agenda, but if you haven't paid attention to people's need to be heard, the decisions made at the meeting are undermined and/or disregarded)

**Antidotes**: include process or quality goals in your planning; make sure your organization has a values statement which expresses the ways in which you want to do your work; make sure this is a living document and that people are using it in their day to day work; look for ways to measure process goals (for example if you have a goal of inclusivity, think about ways you can measure whether or not you have achieved that goal); learn to recognize those times when you need to get off the agenda in order to address people's underlying concerns

**Worship of the Written Word**   *This is true, legally –*

- if it's not in a memo, it doesn't exist
- the organization does not take into account or value other ways in which information gets shared   *why is this? why white*
- those with strong documentation and writing skills are more highly valued, even in   *supremacy?*
  organizations where ability to relate to others is key to the mission antidotes: take the time
  to analyze how people inside and outside the organization get and share information; figure
  out which things need to be written down and come up with alternative ways to document
  what is happening; work to recognize the contributions and skills that every person brings to
  the organization (for example, the ability to build relationships with those who are important
  to the organizationís mission)
- only one right way
- the belief there is one right way to do things and once people are introduced to the right
  way, they will see the light and adopt it
- when they do not adapt or change, then something is wrong with them (the other, those not
  changing), not with us (those who know the right way)
- similar to the missionary who does not see value in the culture of other communities, sees
  only value in their beliefs about what is good

**Antidotes**: accept that there are many ways to get to the same goal; once the group has made a
decision about which way will be taken, honor that decision and see what you and the
organization will learn from taking that way, even and especially if it is not the way you would have
chosen; work on developing the ability to notice when people do things differently and how those
different ways might improve your approach; look for the tendency for a group or a person to keep
pushing the same point over and over out of a belief that there is only one right way and then
name it; when working with communities from a different culture than yours or your organization's,
be clear that you have some learning to do about the communities' ways of doing; never assume
that you or your organization know what's best for the community in isolation from meaningful
relationships with that community

**Paternalism**

- decision-making is clear to those with power and unclear to those without it
- those with power think they are capable of making decisions for and in the interests of
  those without power   *That's the nature of power –*
- those with power often don't think it is important or necessary to understand the viewpoint
  or experience of those for whom they are making decisions
- those without power understand they do not have it and understand who does
- those without power do not really know how decisions get made and who makes what
  decisions, and yet they are completely familiar with the impact of those decisions on them

**Antidotes**: make sure that everyone knows and understands who makes what decisions in the
organization; make sure everyone knows and understands their level of responsibility and
authority in the organization; include people who are affected by decisions in the decision-making

## Either/Or Thinking

- things are either/or, good/bad, right/wrong, with us/against us
- closely linked to perfectionism in making it difficult to learn from mistakes or accommodate conflict
- no sense that things can be both/and
- results in trying to simplify complex things, for example believing that poverty is simply a result of lack of education
- creates conflict and increases sense of urgency, as people are felt they have to make decisions to do either this or that, with no time or encouragement to consider alternatives, particularly those which may require more time or resources

**Antidotes**: notice when people use either/or language and push to come up with more than two alternatives; notice when people are simplifying complex issues, particularly when the stakes seem high or an urgent decision needs to be made; slow it down and encourage people to do a deeper analysis; when people are faced with an urgent decision, take a break and give people some breathing room to think creatively; avoid making decisions under extreme pressure

## Power Hoarding

- little, if any, value around sharing power
- power seen as limited, only so much to go around
- those with power feel threatened when anyone suggests changes in how things should be
- ⚹ done in the organization, feel suggestions for change are a reflection on their leadership —
- those with power don't see themselves as hoarding power or as feeling threatened  But Maybe it
- those with power assume they have the best interests of the organization at heart and  is
  assume those wanting change are ill-informed (stupid), emotional, inexperienced

**Antidotes**: include power sharing in your organization's values statement; discuss what good leadership looks like and make sure people understand that a good leader develops the power and skills of others; understand that change is inevitable and challenges to your leadership can be healthy and productive; make sure the organization is focused on the mission

## Fear of Open Conflict

- people in power are scared of conflict and try to ignore it or run from it
- when someone raises an issue that causes discomfort, the response is to blame the person for raising the issue rather than to look at the issue which is actually causing the problem
- emphasis on being polite
- equating the raising of difficult issues with being impolite, rude, or out of line — or white fragility  if white person knee

**Antidotes**: role play ways to handle conflict before conflict happens; distinguish between being polite and raising hard issues; don't require those who raise hard issues to raise them in acceptable ways, especially if you are using the ways in which issues are raised as an excuse not to address the issues being raised; once a conflict is resolved, take the opportunity to revisit it and see how it might have been handled differently

**Individualism**

*Internal Feeling*

*Assumpts "team" — is work important? What does "team" mean*

- little experience or comfort working as part of a team — *introvert, artists, etc.*
- people in organization believe they are responsible for solving problems alone
- accountability, if any, goes up and down, not sideways to peers or to those the organization is set up to serve
- desire for individual recognition and credit
- leads to isolation
- competition more highly valued than cooperation and where cooperation is valued, little time or resources devoted to developing skills in how to cooperate
- creates a lack of accountability, as the organization values those who can get things done on their own without needing supervision or guidance antidotes: include teamwork as an important value in your values statement; make sure the organization is working towards shared goals and people understand how working together will improve performance; evaluate people's ability to work in a team as well as their ability to get the job done; make sure that credit is given to all those who participate in an effort, not just the leaders or most public person; make people accountable as a group rather than as individuals; create a culture where people bring problems to the group; use staff meetings as a place to solve problems, not just a place to report activities
- i'm the only one
- connected to individualism, the belief that if something is going to get done right, I have to do it
- little or no ability to delegate work to others

**Antidotes**: evaluate people based on their ability to delegate to others; evaluate people based on their ability to work as part of a team to accomplish shared goals

**Progress is Bigger, More**

- observed in systems of accountability and ways we determine success
- progress is an organization which expands (adds staff, adds projects) or develops the ability to serve more people (regardless of how well they are serving them)
- gives no value, not even negative value, to its cost, for example, increased accountability to funders as the budget grows, ways in which those we serve may be exploited, excluded, or underserved as we focus on how many we are serving instead of quality of service or values created by the ways in which we serve

**Antidotes**: create Seventh Generation thinking by asking how the actions of the group now will affect people seven generations from now; make sure that any cost/benefit analysis includes all the costs, not just the financial ones, for example the cost in morale, the cost in credibility, the cost in the use of resources; include process goals in your planning, for example make sure that your goals speak to how you want to do your work, not just what you want to do; ask those you work with and for to evaluate your performance — *outside independent, assessment*

## Objectivity

- the belief that there is such a thing as being objective
- the belief that emotions are inherently destructive, irrational, and should not play a role in decision-making or group process
- invalidating people who show emotion
- requiring people to think in a linear fashion and ignoring or invalidating those who think in other ways
- impatience with any thinking that does not appear logical to those with power

**Antidotes**: realize that everybody has a world view and that everybody's world view affects the way they understand things; realize this means you too; push yourself to sit with discomfort when people are expressing themselves in ways which are not familiar to you; assume that everybody has a valid point and your job is to understand what that point is

*white fragility is a "power play"*

## Right to Comfort

- the belief that those with power have a right to emotional and psychological comfort (another aspect of valuing logic over emotion)
- scapegoating those who cause discomfort
- equating individual acts of unfairness against white people with systemic racism which daily targets people of color

**Antidotes**: understand that discomfort is at the root of all growth and learning; welcome it as much as you can; deepen your political analysis of racism and oppression so you have a strong understanding of how your personal experience and feelings fit into a larger picture; don't take everything personally

One of the purposes of listing characteristics of white supremacy culture is to point out how organizations which unconsciously use these characteristics as their norms and standards make it difficult, if not impossible, to open the door to other cultural norms and standards. As a result, many of our organizations, while saying we want to be multicultural, really only allow other people and cultures to come in if they adapt or conform to already existing cultural norms. Being able to identify and name the cultural norms and standards you want is a first step to making room for a truly multicultural organization.

DISCUSSION QUESTIONS:

- Which of these characteristics are at play in your life? In the life of your organization or community?
- How do they stand in the way of racial justice?
- What can you and your community do to shift the belief(s) and behavior(s) to ones that support racial justice?